Edward J. DRISCOLL, Chairman, Commerce Commission, and Marvin L. Rye, Commissioner of Banks, State of Minnesota, Plaintiffs,

Independent Bankers of Minnesota, a nonprofit corporation, Plaintiff-Intervenor,

Commercial State Bank, a state bank, Plaintiff-Intervenor,

v.

NORTHWESTERN NATIONAL BANK of ST. PAUL, a national banking association, and William B. Camp, Comptroller of the Currency of the United States, Defendants.

No. 3–72–Civ–42.

United States District Court,
D. Minnesota,
Third Division.

Oct. 25, 1972.

**246**

Warren Spannaus, Atty. Gen. of State of Minnesota, Curtis D. Forslund, Sol. Gen. of State of Minnesota, and Steven M. Gunn, Sp. Asst. Atty. Gen. of State of Minnesota, St. Paul, Minn., for plaintiffs.

Hansen, Hazen, Dordell & Bradt, Horace R. Hansen, St. Paul, Minn., for plaintiff-intervenor Independent Bankers of Minnesota.

Cummins, Gislason, Sheahan, Joyce & McHaffie, Carl W. Cummins, Jr., St. Paul, Minn., for plaintiff-intervenor Commercial State Bank.

Faegre & Benson, Lawrence C. Brown, Minneapolis, Minn., for defendant Northwestern Nat. Bank of St. Paul.

Robert G. Renner, U. S. Atty., and J. Earl Cudd, Asst. U. S. Atty., Minneapolis, Minn., and Edward Jiran, Office of Comptroller of the Currency, Washington, D. C., for defendant William B. Camp.

## MEMORANDUM & ORDER
## FOR JUDGMENT

DEVITT, Chief Judge.

The broad issue in this declaratory judgment action is whether the Northwestern National Bank of St. Paul is operating more than one branch bank in violation of state and federal banking laws. Minnesota law prohibits branch banking except to the limited extent of allowing state banks to operate one "detached facility." This restriction is incorporated into federal law and made applicable to national banks by 12 U.S.C. § 36(c)(1)[1].

Northwestern National Bank of St. Paul presently operates two paying and receiving facilities other than at its main banking floor: the first consists of three walk-up television tellers in the Skyway Building, approximately 300 feet from its main banking office in the Northwestern Bank Building; the second consists of six teller stations in the Endicott Building, approximately one and one-half blocks from Northwestern's main banking office. Each of these facilities is within a twelve block skyway system providing covered passageways between business places in the downtown St. Paul loop.

Plaintiffs, state officials responsible for supervising state chartered banks, ask the Court to enjoin Northwestern from operating its facility in the Endicott Building and to declare that defendant Camp, Comptroller of the Currency, unlawfully approved the application of

---

1. Subsection (c) reads in part: "A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) . . . if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question."

Northwestern for a branch bank in the Endicott Building at a time when Northwestern already operated the one detached facility permitted by state law in the Skyway Building. Plaintiff-intervenors, a state bank competing with Northwestern in downtown St. Paul and an association of 490 state and national banks in Minnesota, were permitted to join plaintiffs on the original complaint under Rule 24(b).

All parties agree that there is no fact dispute and submit the issue on cross motions for summary judgment. Jurisdiction rests on 28 U.S.C. § 1331, the matter in controversy exceeding $10,000 exclusive of interest and costs.

In 1964 Northwestern applied for and received approval from the Comptroller to establish new offices in the then proposed Northwestern Bank Building as part of the new skyway system in downtown St. Paul. Somewhat later, Northwestern planned a walk-up teller station consisting of three television teller machines, to be located on a wide pedestrian concourse in the adjacent Skyway Building approximately 300 feet from its main banking office on a wide pedestrian concourse.

In 1965 the Comptroller approved Northwestern's plans for the walk-up tellers (Skyway facility) finding that the proposed facility was merely an extension of the main banking premises and not a "branch" under federal law requiring certification by the Comptroller. Minnesota law in 1965 prohibited state

banks from branching in any form,[2] including operation of a detached facility.

On June 7, 1971, a new state statute became effective, permitting state banks in Minnesota to establish a single "detached facility"[3] apart from a bank's chartered premises for the purpose of performing paying and receiving functions.[4] The law provided that state banks already operating a detached facility would be restricted to that one existing facility.[5] On June 14, 1971 Northwestern applied to the Comptroller for permission to establish a "detached facility," the so-called Endicott branch, in the Endicott Building approximately one and one-half blocks from its main office. The application was accepted as a branch application under 12 U.S.C. §§ 36(c) and (f).

All plaintiffs and plaintiff-intervenors, after receiving notification of the application, objected on the grounds that the applicant's walk-up teller stations in the Skyway Building constituted the single, existing detached facility permitted by the new state statute and that the establishment of a second detached facility by Northwestern would constitute an illegal branch in violation of 12 U.S.C. § 36(c)(1). It was felt that this violated not only the express wording of the law but also that it did violence to the notion of equality in competition between state and national banks contemplated by federal banking laws and particularly the McFadden Act of 1927. Officers of competing banks were of the view that the Comptroller's decision could presage

2. M.S.A. § 48.34.

3. Minn.Laws 1971, ch. 855, § 1, defines "detached facility" as " . . . a structure or remotely controlled stationary mechanical device serving as a drive-in or walk-up facility, or both, located separate and apart from the main banking house, containing one or more tellers windows which is not an 'attached facility' . . . " An "attached facility" does not specifically encompass remotely controlled devices and it is " . . . affixed to and is an integral part of the main banking house and not severable therefrom without structural damage or changes."

4. Minn.Laws 1971, ch. 855, § 2, authorizes any bank doing business in Minnesota to maintain not more than one detached facility. Chapter 855 does not expressly amend M.S.A. § 48.34.

5. Minn.Laws 1971, ch. 855, § 5, states that "[a] bank may retain and operate one detached facility as it may have had in operation prior to May 1, 1971 . . . " but that " . . . [a] bank having such a retained facility shall be limited to operating that one detached facility."

a proliferation of more television teller stations by national banks in the Skyway system to the competitive disadvantage of state banks, none of which were connected, or likely to be connected, to the Skyway system.

Plaintiff-intervenors and others participated in a subsequent hearing before the Comptroller's hearing panel in Minneapolis on July 13, 1971. The record reflects that in early 1971 leaders of the Independent Bankers of Minnesota decided to attempt to remedy the allegedly unequal situation by drafting and urging the enactment of an appropriate state statute. The result was Minn. Laws 1971, ch. 855, which defines "attached" and "detached" facilities and provides that each state bank could have one, and only one, "detached" facility. Representatives of the Independent Bankers of Minnesota also said at the hearing that the intention of the proponents was to legitimatize Northwestern's Skyway facility as the one permitted "detached facility", to authorize other banks to also have one "detached facility" and thus to equalize the competitive equality between state and national banks.

It was urged at the hearing that Northwestern's application for the Endicott branch should be denied because Northwestern already had the one "detached" facility to which it was entitled under the new state statute and the action of the Comptroller in approving the application would therefore be in violation of the law, 12 U.S.C. § 36(c)(1).

Northwestern's application for permission to establish the Endicott branch was subsequently approved. It is this approval which plaintiffs and plaintiff-intervenors claim is unlawful in that it allows Northwestern, a national bank, to operate two detached facilities in violation of the state law, which limits state banks to one detached facility.

Plaintiffs and plaintiff-intervenors contend that the Comptroller was obligated to apply the state law in making his determination in 1971 and that such obligation was mandatory rather than discretionary. Defendants, on the other hand, claim that the Comptroller was only obligated to determine whether the Skyway facility was a branch under federal law, which he did in 1965, that he could rely on that determination without referring to the state law when deciding upon Northwestern's application for the Endicott branch in 1971, and that his determination in 1965 is valid unless found to be arbitrary, capricious or not in accordance with law.

■ In reviewing the action of an administrative official, we are to determine not the correctness or wisdom of his decision but whether his action was permissible under the law and facts. Here the Comptroller's decision must be upheld if it is not arbitrary and capricious. Sterling National Bank of Davie v. Camp, 431 F.2d 514 (5th Cir. 1970), cert. denied 401 U.S. 925, 91 S.Ct. 879, 27 L.Ed.2d 829 (1971). We are limited to determining whether there is warrant in the law and in the facts for the action taken by the administrative official, and in doing so we must afford recognition to the presumed "expertise" of the administrator in the field involved and only rarely, says Mr. Justice Douglas, are we justified in disturbing it. See cases cited at footnote 2, dissenting opinion of Mr. Justice Douglas in First National Bank in Plant City, Fla. v. Dickinson, 396 U.S. 122, 140, 90 S.Ct. 337, 346, 24 L.Ed.2d 312 (1969).

■ I am satisfied that there is adequate support in the record for the decision reached by the Comptroller in 1965 that the Skyway facility was an integral part of the main bank premises. The record is a large one and it would be superrogatory to summarize all of it. It is enough to say that the Comptroller reached the conclusion he did for the following reasons, as summarized by the defendants:

1. That the TV tellers are located within the same building as the balance of the bank's main office operations;

2. That the TV tellers are physically connected to the balance of the bank's main office operations by pneumatic tube, telephone, and TV cables;

3. That the TV tellers are immediately available to only those pedestrians who are already within the pedestrian concourse which passes through the bank's main banking floor;

4. That the TV tellers are separate from the balance of the bank's main office by less than 300 feet and from parking facilities used by the bank by less than 90 feet of continuous and open pedestrian concourse;

5. That no physical barrier exists within the pedestrian concourse between the TV tellers and the balance of the bank's main office;

6. That the TV tellers are totally dependent for operation upon their physical connection to a manned teller station within another portion of the bank and are inoperable during those hours of the day when the operating teller within the other portion of the bank is absent (i. e., non-business hours);

7. That the TV tellers have no records or cash supply of their own, but are, instead, totally dependent upon cash and documents maintained elsewhere in the bank's main office building;

8. That the close physical and operation nexus between the TV tellers and the balance of the bank's main office is consistent with the innovative redevelopment plan of which the building is a part and adequately insures that the TV tellers will be regarded as part of the main office of the bank by the public; and

9. That use of the TV tellers does not in any manner constitute expansion into a new banking market or otherwise create an imbalance of competitive opportunity in Northwestern's trade area.

The plaintiff-intervenors take exception to all but one of these factors as being supportive of the conclusion reached. They detail arguments contrary to those of the Comptroller and especially to the view of the Comptroller stated in #9 above that grant of authority to operate the skyway facility will not create an imbalance of competitive opportunity in Northwestern's trade area. It is strongly urged that the skyway facility will seriously impinge upon the present normal trade area of the Commercial State Bank.

Plaintiff-intervenors say that the skyway facility properly could not be considered an integral part of the main banking premises, as found by the Comptroller, when the main banking building is owned by the Sheridan Partnership and is separately designated as the Northwestern Bank Building while the skyway facility is located in a separate, albeit adjacent building, known as the Skyway Building and is owned by a different owner, the Eljay Partnership. It is pointed out that the main banking office is located in Block D and the Skyway facility is located in Block E, and that Cedar Street separates the main bank premises from the skyway facility. The separateness of the units is emphasized, plaintiff-intervenors argue, by the presence of eight retail businesses of various kinds on the pedestrian concourse separating the television teller stations from the main banking floor.

There are particular persuasive facts and meritorious arguments on each side of the issue. The Comptroller's overall view appears to be based on an evaluation of modern metropolitan building practices with adjacent buildings connected by pedestrian walkways and the relation of such to the conduct of banking businesses within them. He saw the Northwestern Bank Building and the Skyway Building as constituting a unified single structure with a single continuous design internally and externally and without any distinguishable separations or division between them. He evaluated these proposed structures and their close, melded interconnection, and came to the conclusion that architecturally and practically, the two buildings

would constitute a single unified complex. He viewed the teller stations and the main banking floor as "but one operation in the public mind."

The Comptroller's decision finds support in the opinions expressed by the Minnesota Attorney General in advising the State Commissioner of Banks, in situations similar to the one before the Court, that certain drive-in or walk-up facilities within the state were not branches but rather a part of the main banking house. In making these decisions, the Attorney General emphasized the "identity of administration and location" and applied a rule of reason in determining whether specific activities of a bank constituted extension of existing premises or a branch.

In 1951 he advised that a proposed drive-in, walk-up installation to be operated by Northwestern National Bank of Minneapolis in rented premises across the street from its main banking office and connected to it by pneumatic tubes and telephone was not a branch in violation of 12 U.S.C. § 36 and the then Minnesota law. Again in 1955 the Attorney General ruled that the proposed action of the First National Bank of St. Paul in operating a tellers window in a structure across Fourth Street from its main bank building and connected to it by underground pneumatic tubes and telephone was permissible. And in 1960, the Attorney General held that the pertinent Federal and State laws were not violated by the Farmers First National Bank of Alexandria in operating a drive-in facility located in a separate building to be constructed some 127 feet from its main bank building and connected thereto by pneumatic tube and telephone.

From an examination of the record as a whole I conclude that there is adequate support therein for the conclusion reached by the Comptroller in 1965 that the Skyway facility was closely identified in administration and location with the main banking floor and was an integral part of the main banking premises and therefore not a branch bank under 12 U.S.C. § 36(f). This was a permissible conclusion for him to reach under the law.

The remaining issue is whether, in considering the Endicott application in 1971, the Comptroller was to be governed by state or federal law.

█ National banks are permitted, with the Comptroller's approval, to establish and operate their main offices free from restrictions of state law, 12 U.S.C. §§ 26 and 27, but in considering applications to establish "branches", the Comptroller is limited to approving those federal branches permitted by state law as to state banks, 12 U.S.C. § 36(c). The Comptroller had made the judgment in 1965 that the Skyway facility was not a branch but a part of the main banking office. In considering the Endicott application in 1971, he was not obligated to reconsider his 1965 decision in the light of a branch bank or "detached facility" as set out in the 1971 law (albeit that definition reasonably might be interpreted as fitting the Skyway facility). His obligation was to be guided by the Federal Statute, 12 U.S.C. § 36(f).[6] Authority for this is clearly stated in *Dickinson,* supra at 133, 90 S. Ct. at 343 where the Court said:

"We reject the contention made by *amicus curiae* National Association of Supervisors of State Banks to the effect that state law definitions of what constitutes 'branch banking' must control the content of the federal definition of 36(f)."

To permit the Minnesota Legislature to define the Skyway facility as a branch or "detached" facility and to obligate the Comptroller to apply that law would permit the legislature to overrule the prior decision of the Comptroller that it was not a branch under federal

---

6. 12 U.S.C. § 36(f) defines "branch" to include ". . . any branch bank, branch office, branch agency, additional office, or any branch place of business . . . at which deposits are received, or checks paid, or money lent."

law. Then state, not federal, law would govern the content of the term "branch." This would be contrary to the teachings of *Dickinson,* supra.

Speaking for the Court, Chief Justice Burger, while allowing that under the federal statute, state law does come into play in deciding *how, where,* and *when* branch banks may be operated, said:

> "But to allow the States to define the content of the term 'branch' would make them the sole judges of their own powers. Congress did not intend such an improbable result, as appears from the inclusion in § 36 of a general definition of 'branch.' At page 343 of 90 S.Ct."

At an earlier date the United States Supreme Court had occasion to observe concerning the national character of national banks and of the exclusive character of congressional authority over them. The Court said that national banks " * * * are not to be interfered with by state legislative or judicial action, except so far as the lawmaking power of the government may permit." Mercantile National Bank at Dallas v. Langdeau, 371 U.S. 555, 559, 83 S.Ct. 520, 522, 9 L.Ed.2d 523 (1963). That the lawmaking power of the government has not authorized the states to define a "branch" bank is made clear by the Supreme Court in its later decision in *Dickinson,* supra. The status of the law was succinctly stated recently by the Court of Appeals for the Tenth Circuit in North Davis Bank v. First National Bank of Layton, 457 F.2d 820, 823 (1972), when it said, "What constitutes a branch of a national bank is to be determined by the definition in § 36(f), not local law."

■ I conclude that, understandable as may be the efforts of the State Banking Commissioner and the Independent Bankers of Minnesota, to espouse the position of state banks in their competition with national banks, especially in metropolitan areas where skyway systems are being built to the apparent advantage of national banks with their predominately downtown locations, the law, as interpreted by the Supreme Court of the United States, vests authority in the Federal, not the state, government to define the content of the term "branch" as it applies to national banks and that the Comptroller acted properly in exercising his authority solely with reference to the definition contained in 12 U.S.C. § 36(f) and reached a permissible conclusion in doing so.

The Clerk is directed to enter judgment for the defendants.