484 F.2d 173
 Edward J. DRISCOLL and Marvin L. Rye, Independent Bankers of
Minnesota, Commercial State Bank, Appellants,
v.
NORTHWESTERN NATIONAL BANK OF ST. PAUL and William B. Camp, Appellees.
 Nos. 73-1019, 73-1073.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 14, 1973.
Decided Aug. 13, 1973.
 
 Steven M. Gunn, Sp. Asst. Atty. Gen., St. Paul, Minn., made argument for appellant, Driscoll.
 Michael H. Stein, Atty., Dept. of Justice, Washington, D. C., made argument for appellee, Camp.
 Rodger Nordbye, Minneapolis, Minn., made argument for appellee, Northwestern National Bank.
 Before Mr. Justice CLARK,* HEANEY, Circuit Judge, and SCHATZ, District Judge.**
 
 
 1
 CLARK, Associate Justice.
 
 
 2
 This declaratory judgment action presents the relatively narrow question of whether appellee Northwestern National Bank of St. Paul, Minnesota (Northwestern), is operating more than one branch bank in violation of state and federal law. This issue was submitted to the District Court and was decided by it on cross-motions for summary judgment. Northwestern presently operates two paying and receiving facilities in addition to its main banking floor. One such facility, which was installed in February, 1971, consists of three walk-up television tellers in the Skyway Building located some 300 feet west of Northwestern's main banking office, and the other houses six teller stations in the Endicott Building, approximately one and one-half blocks east of the main office. The main office and the two detached facilities are all within a 12 block skyway system that provides covered passageways between buildings and places of business in a section of downtown St. Paul. The District Court, 349 F.Supp. 245, ruled that the 1965 informal action of the Comptroller of the Currency held the walk-up TV tellers to be an extension of its main banking premises and consequently that, under the Minnesota state statute of June, 1971, Northwestern would be entitled to operate a detached facility in the Endicott Building on the same skyway pedestrian concourse but located about a block and a half east of Northwestern's main office and across the street.
 
 
 3
 We have carefully considered the record before the Comptroller of Currency, as well as the one before the trial court, and have concluded that the summary judgment must be reversed and the action remanded to the Comptroller for further consideration.
 
 1. The Facts:
 
 4
 In 1965, before the present main banking premises of Northwestern had been built, it wrote the Comptroller of Currency soliciting his opinion as to whether its proposed walk-up TV teller facility would constitute a "branch bank" requiring his approval. See 12 U.S.C. Sec. 36. Northwestern represented that its proposed new main banking offices in Capital Centre, then under construction, would "occupy continuous space running from a depository and multi-purpose tellers . . . through to the main concourse, approximately 300 feet away, from which the major banking facilities . . . would fan out." The walk-up TV teller facility now in controversy would be located about 300 feet away from the main banking premises but connected by a telephonic communication, by a pneumatic tube for the speedy transfer of cash and by a tunnel connection under the street for the transfer of freight as well as by a continuous and uninterrupted pedestrian concourse "along which it is possible that the Northwestern will ultimately be leasing all or a major portion of the 'retail space."' Some six weeks thereafter the Comptroller of Currency replied that he did not consider the proposed three TV teller stations to be a branch bank but rather an extension of the main banking premises: "These locations, because of their proximity, will constitute but one operation in the public mind." Certification of the walk-up TV teller facility, he advised, was thus not required and no certification was issued. After completion of its new main banking facility, Northwestern put this TV teller facility into operation in February, 1971.
 
 
 5
 In June, 1971, Minnesota amended its banking laws to permit each state bank one "detached facility," where previously no branching at all had been permitted. 1971 Minnesota Session Laws, Ch. 855. The statute defined the term "detached facility" as well as "attached facility" with exact precision, placing the three TV teller stations of Northwestern clearly within the term "detached facility" and limiting the number of such facilities to one. Northwestern, however, applied to the Comptroller of Currency for permission to establish the Endicott facility as its one detached facility under the new state law. Several of the appellants here opposed the application and participated in a hearing held by the Comptroller of Currency. However, the application was approved whereupon they brought this suit founded on the proposition that both the walk-up TV teller facility and the Endicott one were branch banks and that Minnesota law only permitted one such facility. The District Court agreed with the Comptroller of Currency and entered the summary judgment aforesaid.
 
 2. Branch Banking:
 
 6
 It is settled that the McFadden Act, which, as amended, is the controlling statute here, was "intended to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned." First National Bank v. Walker Bank and Trust Co., 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343 (1966); First National Bank v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). Thus, national banks may compete through branch banking only to the extent that state law permits state banks to utilize this means of competition. Of course, federal law does not incorporate every restriction and limitation that a state sees fit to impose on banks chartered under its own authority, and for this reason the threshold question of whether a proposed enlargement of a national bank is a "branch" is a question of federal law to be determined initially by the Comptroller and reviewed by the federal courts. First National Bank v. Dickinson, supra. However, the overriding policy of the act is one of "competitive equality" between state and national banks. The Comptroller's action here is, therefore, quite disturbing. A Minnesota state bank under 1971 state law concededly cannot enjoy the three facilities which Northwestern claims here but must be content with one detached facility. Since the success of the competitive equality doctrine depends to a significant degree on the Comptroller's determination of whether in a given case a proposed facility constitutes a "branch," the courts must carefully examine the sufficiency of the factual considerations on which the Comptroller's decision is based.
 
 
 7
 3. Basis of the Comptroller of Currency Decision:
 
 
 8
 In 1965 the Comptroller of Currency gave Northwestern his informal opinion that the walk-up TV teller facility, as then proposed, would not be a branch bank requiring certification. This advice was based on Northwestern's ex parte representations in 1965 as to the nature of the proposed facility and its location with respect to the proposed new main office premises of the bank. As we have noted, the walk-up TV tellers were not put into operation until almost six years after the Comptroller gave the bank the green light. The changing times pertaining to the proposed facility had transformed it in significant respects. As previously stated, in its April 6, 1965 letter to the Comptroller of Currency, Northwestern represented that "it is possible that the Northwestern will ultimately be leasing all or a major portion of the 'retail space"' along the pedestrian walkway between the main bank office and the walk-up TV tellers some 300 feet away. However, this situation did not materialize with respect to the skyway system since admittedly Northwestern neither occupied nor controlled any of this space. In fact, eight retail businesses and two vacant store spaces separated the walk-up TV teller station from Northwestern's main banking floor. Indeed, as constructed, a customer at one of the walk-up TV stations cannot see the entrance to the main banking office. In addition, prior to Northwestern's application to be allowed a facility in the Endicott Building the State of Minnesota had adopted a new bank-branching law. However, the Comptroller of Currency did not consider the 1971 validity of his old 1965 action which held that the walk-up TV tellers were part of the main facility "because of their proximity, will constitute but one operation in the public mind." Finally, as indicated in the affidavit of the Comptroller of Currency, his 1965 decision was predicated on a finding that the walk-up TV teller facility "does not in any manner constitute expansion or otherwise create an imbalance into a new banking market or otherwise create an imbalance of competitive opportunity in Northwestern's trade area." It is not clear in the record what information the Comptroller relied on in making this finding. It shows that there are 16 banks within a radius of 3 miles of Northwestern with only three of them being national banks. An affidavit of a vice president of the Commercial State Bank states that the effect of the ruling of the Comptroller of Currency here "could only be disastrous for the small state banks . . ."
 
 
 9
 While at argument the learned trial judge inquired whether the Comptroller of Currency had "an obligation . . . to go back . . . and look at the judgment made in 1965 . . ." The Comptroller of Currency insisted to the contrary and the court later held with him. We cannot agree. Given the foregoing discrepancies in the record, we think that the Comptroller was obligated to make a fresh determination as to whether the walk-up TV teller station was a branch bank. The 1965 decision was quite informal, was not implemented until 1971, and was never subjected to court review. The Comptroller's affidavit of May 16, 1972 does no more than attempt to give flesh to his 1965 decision; it does not purport to reevaluate the situation as of 1971. Nor did the Comptroller of Currency weigh the effect of Minnesota's new branch banking law on Northwestern's claim for a second detached facility which is not permitted state banks. While its definition is not controlling with respect to national banks, it is certainly relevant to the Comptroller's decision in the light of the Congressional mandate that he must maintain a state of "competitive equality" between state and national banks. See First National Bank v. Dickinson, supra, 396 U.S. at 136-137, 90 S.Ct. 337.
 
 
 10
 We therefore reverse the judgment with instructions that the case be remanded to the Comptroller for his further consideration consistent with this opinion.
 
 
 11
 Reversed and remanded.
 
 
 
 *
 Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation
 
 
 **
 District Judge Albert G. Schatz, District of Nebraska, is sitting by designation