MERCHANTS & PLANTERS BANK OF
NEWPORT, ARKANSAS, and First
National Bank of Newport, Arkansas,
Plaintiffs,

v.

James E. SMITH, Comptroller of the
Currency of the United States,
Defendant,

Jackson County National Bank,
Intervenor.

No. B–73–C–18.

United States District Court,
E. D. Arkansas, N. D.

Aug. 1, 1974.

James A. McLarty, Newport, Ark., for
Merchants & Planters Bank of Newport.

Marvin D. Thaxton, Newport, Ark.,
for First National Bank of Newport.

W. H. Dillahunty, U. S. Atty. and
Fletcher Jackson, Asst. U. S. Atty., East-

ern District of Arkansas, Little Rock, Ark., and Edward Jiran, Atty., Office of the Comptroller of the Currency, Washington, D. C. for James E. Smith, Comptroller of the Currency of the United States.

Thomas A. Callaghan, Jr., Washington, D. C., and Sam Boyce, Newport, Ark., for Jackson County National Bank.

' MEMORANDUM OPINION

HENLEY, Chief Judge.

This is a suit for declaratory and injunctive relief brought by the Merchants & Planters Bank of Newport, Arkansas, and the First National Bank of Newport, Arkansas, against James E. Smith, Comptroller of the Currency of the United States. Plaintiffs seek to invalidate a 1973 determination by Acting Comptroller Justin T. Watson that an application submitted by the First National Bank of Tuckerman, Arkansas, the name of which was later changed to Jackson County National Bank, pursuant to 12 U.S.C.A., section 36(c) as amended, for leave to open a branch bank in the City or Town of Diaz in Jackson County, Arkansas, should be granted. That application was alternative to an original application submitted pursuant to 12 U.S.C.A., section 30 for leave to move the main office of the applicant from the City of Tuckerman, Arkansas, to Diaz while retaining its original main office at Tuckerman as a branch bank as authorized by Arkansas Act 15 of 1973, Ark.Stats., Ann., Cum.Supp., section 67–352.2.

The original application was opposed by the banks which are plaintiffs here, and it was not granted. The alternative application, which was granted, was submitted after an administrative hearing on the original application had been held as provided by 12 CFR, section 5.1 et seq. When the protestants were notified of the filing of the alternative application, they objected to its consideration. How-ever, the Comptroller[1] in effect overruled the objection. When the protestants were notified that the alternative application had been considered and granted, they objected and requested an administrative stay. When that application was denied, they commenced this suit on July 27, 1973.

The plaintiffs contend basically that the action of the agency in approving the alternative application that has been described was capricious and arbitrary, constituted an abuse of administrative discretion and was otherwise not in accordance with law. They also contend that the agency had no right to consider the alternative application, and that the agency committed other precedural errors which invalidate the ultimate agency determination. Jurisdiction, which is not questioned, is based upon judicial review provisions of the Administrative Procedure Act, 5 U.S.C.A., section 701 et seq., and upon 28 U.S.C.A., section 1331(a).

On September 28, 1973, the Comptroller filed his answer. On October 9, 1973, the Jackson County National Bank obtained leave to intervene in the case as a defendant, and on the same day it filed an answer and a counterclaim against plaintiffs alleging that in opposing the original and alternative applications plaintiffs violated the federal anti-trust laws and are liable to the intervenor under the Clayton Act, 15 U.S.C.A., section 15. In due course plaintiffs filed their reply to the counterclaim.

In early 1974 the Comptroller and the intervenor filed motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure praying that the complaint be dismissed. Plaintiffs oppose the motions, and the motions have been briefed thoroughly.

Disgressing for a moment, it is noted that when the suit was filed no certificate had been issued by the Comptroller authorizing the opening of the branch

I. The term "Comptroller," as herein used, includes the Comptroller of the Currency and his responsible subordinates. At times the term "the agency" will be used in lieu of "the Comptroller."

bank at Diaz, although the Comptroller had advised all concerned that the alternative application would be granted and that an administrative stay would be denied. The prayer of the complaint was that a declaratory judgment be entered to the effect that the Comptroller had acted unlawfully and that the Court "issue a preliminary injunction restraining comptroller from proceeding further and issue an order of remand of the matter to the comptroller for findings, conclusions and a well reasoned opinion justifying the issuance of authority to the applicant to branch into the town of Diaz, Arkansas . . . ."

Although the complaint contained the prayer for preliminary injunctive relief that has been mentioned, plaintiffs never filed any formal motion for a preliminary injunction and never called upon the Court to grant the preliminary relief asked for in the complaint. Consequently, that particular phase of the case has never been considered by the Court, and no preliminary injunction has been issued. Whether one would have been issued had plaintiffs requested that action specifically is an open question.

In late August 1973 plaintiffs filed with the Comptroller a formal motion for reconsideration of his determination, and that motion or request was formally denied by the agency on October 30, 1973.

In view of the absence of any preliminary injunction the intervenor proceeded to meet the conditions that had been imposed by the Comptroller upon his grant of operating authority; it increased its capital substantially and made certain changes in its personnel, and it constructed at very substantial cost a bank building in Diaz. In early March of this year the Comptroller issued his formal certificate authorizing the opening of intervenor's branch bank, and it is the Court's information that the branch was

opened and is now doing business. Intervenor's main office continues to be located at Tuckerman.

The plaintiffs were aware of the fact that no preliminary injunction had been issued, and they were also aware of at least the fact that the intervenor was constructing its branch bank building. On the other hand, the intervenor was aware of the fact that this suit was pending, and intervenor certainly had no right to assume that plaintiffs would inevitably lose their case.[2]

The cause is now before the Court on the motions of the defendant and intervenor for summary judgment dismissing the complaint, and the Court considers that the question of whether the complaint should be dismissed is appropriate for summary disposition. See Sterling National Bank of Davie v. Camp, 5 Cir., 1970, 431 F.2d 514, and First National Bank of Fayetteville v. Smith, W.D.Ark., 1973, 365 F.Supp. 898.

The record before the Court consists of the pleadings and motions, certain discovery material, and a complete record of the preceedings before the agency, including the proceedings in connection with plaintiffs' formal application for a reconsideration of the agency's initial determination that intervenor should be permitted to operate in Diaz.

■ The scope of review available to plaintiffs in this action is quite limited. The Court does not try the case de novo and is not at liberty to substitute its judgment for the discretion of the Comptroller, assuming that that discretion was permissibly exercised. If the Comptroller committed no procedural errors that would call for a remand to the agency, if his determination had a rational basis in fact, which basis is established by the administrative record, and if he did not act arbitrarily or capriciously or otherwise contrary to law, the complaint

---

2. The Court has made the statements appearing in the preceding paragraph because the intervenor contends, among other things, that the plaintiffs have been guilty of laches in not pressing their request for a preliminary injunction, and that the alleged laches itself constitutes a ground for dismissing the complaint. The Court finds it unnecessary to pass on that contention.

must be dismissed; it is immaterial that the Court may not agree with the determination that was made. See e. g.: Camp v. Pitts, 1973, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106; Bank of Commerce of Laredo v. City National Bank of Laredo, 5 Cir., 1973, 484 F.2d 284; First National Bank of Fairbanks v. Camp, 9 Cir., 1972, 465 F.2d 586; Sterling National Bank of Davie v. Camp, supra; Webster Groves Trust Co. v. Saxon, 8 Cir., 1966, 370 F.2d 381; First National Bank of Fayetteville v. Smith, supra; Driscoll v. Northwest National Bank of St. Paul, D.C.Minn., 349 F.Supp. 245.[3]

Before stating any more facts or attempting to discuss the contentions of the parties, it may be helpful to look at relevant State and federal statutes and at the regulations that the Comptroller has promulgated which apply to the procedures to be followed in connection with applications made to him for the chartering of new national banks, for the establishment of branch banks, and for changes in the names or locations of existing banks.

Title 12, U.S.C.A., sections 26 and 27 authorize the Comptroller to approve or disapprove applications for charters for new national banks and lay down certain guidelines for him to follow in making his determinations with respect to such applications. In passing upon a given application he may consider facts reflected by the application and other facts reported to him or which may come to his knowledge "whether by means of a special commission appointed by him for the purpose of inquiring into the condition of such association, or otherwise." (Section 27.)

Section 30, as amended, authorizes an existing national bank, with the approval of the Comptroller, to change its location within the city or town in which it is situated, or to change its location to another city or town in the same State not more than 30 miles away from that in which the bank is currently operating.

And section 36(c), as amended, provides in substance that a national bank, with the approval of the Comptroller, may establish a branch bank in a city or town in the same State other than that in which its main office is situated if a State bank would be permitted under governing State law to establish a branch bank in the city or town in question.

As has been seen, Arkansas Act 15 of 1973 permits an Arkansas bank to move its main office from one city or town to another in Arkansas and to retain its original plant as a branch bank or "teller's window" at the original location. It was very shortly after this statute was passed that the intervenor filed its original application with the Comptroller.

Very soon after the original application was filed, the Arkansas Legislature adopted another statute that is relevant to this case, namely Act 228 of 1973. Section 2 of that Act, Ark.Stats., Ann., Cum.Supp., section 67–360, provides that any bank legally chartered in Arkansas by either State or federal authority may establish one or more "full service" branches if the bank's supervisory authority, whether State or federal, approves of the establishment and certifies in writing that the establishment of the branch or branches is economically feasible and will serve the public convenience and necessity. However, section 2 goes on to qualify the authority of a bank to establish a branch in certain significant respects, two of which need to be mentioned: (1) the city or town in which the branch is to be established must be located in the same county as is the parent bank and must have a population of 250 or more persons; (2) a branch may not

3. Judge Devitt's holding in *Driscoll* was reversed on the merits by the Court of Appeals for this Circuit without any criticism of his statements with respect to the scope and standard of judicial review in a case of this kind. Driscoll v. Northwestern National Bank of St. Paul, 8 Cir., 1973, 484 F.2d 173.

While an appeal from Senior Judge Miller's holding in First National Bank of Fayetteville v. Smith, supra, is pending, there is no reason to believe that the Court of Appeals will have any reason to quarrel with Judge Miller's statements in this area.

be established in another city or town if that city or town is the site of the main office of another legally chartered bank. The alternative application of the intervenor was based on that statute.

Returning to the federal statutes that have been mentioned it is well established that in performing the functions entrusted to him by those statutes the Comptroller exercises his discretion, which is a broad one. While sections 30 and 36 do not contain the guidelines that appear in sections 26 and 27, it would not appear that the discretionary function that the Comptroller performs under those sections differs qualitatively to any substantial extent from the function that he performs when he determines whether an application for the chartering of a new national bank should be granted. Hence, it would seem that a procedure permissible in connection with a new bank application would also be permissible in connection with an application to change the location of an existing bank or to open a branch bank. Such is the view of the Comptroller as indicated by the fact that 12 CFR, Part 5, which is procedural in nature, is made applicable to applications of all three types.

In Camp v. Pitts, supra, the Supreme Court recognized that in passing on an application for a charter for a new bank the Comptroller is not required either by the National Bank Act or by the Administrative Procedure Act to hold any formal adjudicatory hearing as is required of some agencies or to make formal findings or to file any formal opinion. Nor in the course of judicial review is the correctness of his determination to be judged by the "substantial evidence" rule.

Prior to the promulgation of the current regulations the holding of hearings with respect to applications of the type with which the Court is concerned was discretionary with the Comptroller.

However, in 1971 the Comptroller deemed it well to prescribe procedures for notice and hearing in connection with such applications with the end in view of giving all interested persons an opportunity to express their views. However, section 5.1 states specifically that nothing contained in the regulations is to be construed "to prevent interested persons from presenting their views in a more informal manner when deemed appropriate by the Comptroller, his deputy, or by the Regional Administrator of National Banks, or to prevent the Comptroller or the Regional Administrator from conducting such investigation as may be deemed appropriate."

Subsequent sections of Part 5 make provision for notice and hearing, but section 5.12, which is entitled "Retained authority," provides that the Comptroller "may adopt such different procedures as he deems necessary and reasonable in acting upon any particular application."

As the Court construes those regulations, which are not challenged here, the Comptroller will ordinarily hold a hearing in connection with an application for a new bank, or for the establishment of a branch bank, or for a change in the location of an existing bank, if requested to do so by interested parties, and he will ordinarily follow the procedures which Part 5 prescribes. However, the Comptroller clearly reserves the right to follow some other procedural course or to vary procedures in particular cases where appropriate.[4]

## I.

The contentions of the parties must be evaluated in the light of certain background facts which are not disputed.

Jackson County, Arkansas, is located in the White River Valley in the northeast quadrant of the State. The county seat of Jackson County is the City of Newport, which is located on the bank

---

4. The foregoing analysis of the applicable statutes and regulations is made necessary because of the insistence of plaintiffs that the Comptroller not only acted arbitrarily and capriciously in granting intervenor's alternative application but also committed procedural errors calling for a remand of the case for further administrative action.

of the River. The principal highway running through the County is U. S. Highway No. 67. Newport is traversed by that highway as is the substantially smaller City of Tuckerman which is about ten miles northeast of Newport. In addition to being located on Highway 67, both Newport and Tuckerman are served by the Missouri Pacific Railroad.

The Town of Diaz is also located on Highway 67 about two miles north of Newport. It is a small but rapidly growing community. Jackson County also contains two other small communities, namely Grubbs and Swifton, which are located in the northern part of the County.

Up until a few years ago the economy of Jackson County was based almost exclusively on agriculture. In the last few years, however, the County has experienced very substantial industrialization and economic growth, and its population has increased substantially. This growth is expected to continue during the foreseeable future.

On account of geographical considerations the growth and physical expansion of business, industry, and population of the County have necessarily been channelled along Highway 67 from Newport and in the direction of Tuckerman. And the effect of the expansion has been that Diaz is in actuality merely an extension of Newport. The northward expansion from Newport has been met by a shifting of population and business away from Tuckerman and toward Newport with the result that there is now a concentration of business, industry, and population in the Newport-Diaz area.

Within the boundaries of Diaz and only a short distance north of the city limits of Newport proper, Highway 67 is intersected by Arkansas State Highway No. 17, and the intersection is a strategic one from the standpoint of business and banking.

The banking needs of Jackson County have been served for years by four banks, three of which are parties to this case. The fourth bank, the Bank of Tuckerman, an Arkansas State Bank, located in Tuckerman about a block from intervenor's main office, is not involved in the case. Two other lending agencies that might be mentioned but which are not involved here are a savings and loan association and a Production Credit Association which makes agricultural loans.

The intervenor herein, which it will now be convenient to refer to generally as the applicant, is the smallest of the four banks operating in the County. It is substantially smaller than the Bank of Tuckerman, and it is very much smaller than either of the plaintiff banks. As this decade opened, the applicant's facilities at Tuckerman were antiquated and inadequate for the needs of a modern bank, and its management was not aggressive. As a result its business condition and health were deteriorating, and the deterioration was naturally accelerated by the concentration of business and population in the Newport-Diaz area.

For the purpose of rectifying the situation applicant's management determined to acquire a site for modern and adequate banking facilities in Diaz, and the applicant was able to purchase two acres of land adjacent to the intersection of Highways 67 and 17. The plan, expressed in the original application, was to move the main office of applicant from Tuckerman to Diaz while retaining the original facilities, such as they were, as a branch bank. Such a move was made possible by Act 15 of 1973, but it was necessary for the move to be approved by the Comptroller.

## II.

The original application was filed in February 1973, and the matter came within the jurisdiction originally of the Regional Administrator of National Banks for the Eighth Region, whose office is in Memphis, Tennessee. The notices called for by the regulations were duly given.

Some three weeks after the original application was filed, Act 228 of 1973, which made it possible as a matter of Arkansas law for applicant to establish

a branch bank at Diaz, went into effect. However, that statute did not become involved in the administrative proceedings until late May when the alternative application was filed.

As might have been expected, the two Newport banks vigorously opposed the original application contending that the services that they were rendering for customers in the Diaz area were adequate and would continue to be so, and that to grant the applicant authority to operate in Diaz would damage them unreasonably from the standpoint of competition.

The Regional Administrator, acting pursuant to the regulations, scheduled a hearing to be held on April 16 at Memphis, and the hearing was duly held before a panel consisting of the Regional Administrator and two of his subordinates. Both sides appeared by counsel, and both sides called witnesses and introduced documentary evidence. At the conclusion of the hearing the record was held open for the reception of any additional written material that either side might want to include, and some additional material was submitted. The record was closed on May 7.

In the meantime, the Regional Administrator had caused an investigation of the application to be made by a National Bank Examiner in late March. Under date of March 26 the Examiner submitted to the Regional Administrator a long and detailed report of his investigation and recommended that the application be denied. The report is contained in a letter from the Examiner to the Regional Administrator, which did not contain any recommendation, and in a confidential memorandum to the Administrator which did contain the recommendation just mentioned.

The Examiner was of the opinion that the economy would justify the establishment of a banking facility at Diaz, but felt that a branch bank would do as well as a main office bank. He also was of the opinion that in view of its management history the applicant would probably not be able to render adequate service. He also appears to have been of the opinion that the application was sinisterly motivated. Specifically, he seems to have thought that in connection with the site acquisition the bank officials involved had dealt or were about to deal adversely to their bank; he also had received some information to the effect that the applicant wanted to move the main office of the bank to new and modern facilities in Diaz so as to enhance the saleability of the bank, perhaps to a bank holding company.

On May 9, 1973, the Regional Administrator transmitted the file to the Administrator of National Banks, Office of the Comptroller of the Currency, in Washington, D. C. The transmittal was accompanied by a long covering letter in which concurrence was expressed in the opinion of the Examiner that the application should be denied. One of the points that the Administrator made was that if the application should be granted, the Newport Banks would not be able under Arkansas law to branch into Diaz, but that on the other hand "the applicant has an alternative of establishing a branch at the relocation site, thereby leaving the area open to competition, and accomplishing virtually all of the *disclosed and avowed* purposes." In conclusion, the Administrator wrote:

"In my opinion, the relocation proposal is not reasonable and would result in harm to existing institutions. Moreover, considering the many adverse factors apparent and disclosed concerning these proposals, there is considerable basis for concluding that the applicant's president and certain of the Board members have pursued this course of action for self-dealing purposes. In addition, it is abundantly clear that the proponent's present deteriorated and uncompetitive situation is wholly the result of Board and management decisions over a considerable time span. Therefore, I concur fully with the investigating examiner's conclusion and also recommend disapproval."

In late May 1973 the applicant put forward its alternative application informally and on June 7 submitted the alternative application formally. The formal application was accompanied by a letter from the President of applicant to Mr. Kenneth W. Leaf, Chief National Bank Examiner. In that letter the President stated that the applicant was willing to make changes in management and to increase its capital substantially. The President also undertook to explain to Mr. Leaf the circumstances in which the Diaz site had been acquired.

As has been indicated, the agency considered the alternative application over the objection of the protesting banks, and indicated in late June that the alternative application would be granted. The further administrative steps that were taken in the matter have been described already, and the Court will not repeat that description.

### III.

The Court finds that the procedural complaints of plaintiffs are without merit and may involve to some extent a misconception of the nature of the proceedings before the agency, including the administrative hearing that was held in April. Cf. First National Bank of Fairbanks v. Camp, supra, 465 F.2d at 604.

Plaintiffs complain that the administrative record does not adequately disclose the basis for the agency's action, and that the record is insufficient to permit this Court properly to review that action. And in that connection plaintiffs urge that the agency should have made findings and conclusions and issued an opinion explaining its action.

As the Supreme Court made clear in Camp v. Pitts, supra, the Comptroller is not required by statute to hold hearings, and is not required to file opinions or to make detailed findings and conclusions when dealing with an application for the chartering of a new bank, and this Court thinks that Pitts is applicable to a proceeding in connection with applications filed under sections 30 and 36 as well as to applications filed under sections 26 and 27. See First National Bank of Smithfield v. Saxon, 4 Cir., 1965, 352 F.2d 267. It is enough if the administrative record shows the basis upon which the agency action was taken to an extent sufficient to permit a court to apply to the action the proper standard of review.

One reason why adversary hearings and formal findings, conclusions, and opinions are not required may lie in the nature of the banking business itself. In Webster Groves Trust Co. v. Saxon, supra, 370 F.2d at 385, the Court of Appeals for this Circuit said:

> "The very nature of the decision required by the Comptroller indicates that a formal adversary type hearing would be of little benefit to him in the discharge of his discretionary powers. There is the further factor present that if bank applicants were subject to severe public cross-examination, public presentation of unfavorable evidence and were forced to disclose their future plans and programs to competitors, public confidence in the banking system could be affected adversely."

In Sterling National Bank of Davie v. Camp, supra, the Court of Appeals for the Fifth Circuit carried that proposition a step further. After quoting as this Court has just done from *Webster Groves,* the Court of Appeals went on to say (p. 517 of 431 F.2d):

> "The very considerations which make it undesirable to subject applicants to public cross-examination make it equally undesirable to compel the Comptroller to publish an opinion concerning his reasons for granting or denying a charter . . . . The statute clearly does not require that the Comptroller support his decision with a written opinion, and we think it would be ill-advised for this court to impose a requirement which Congress has not seen fit to demand. We conclude, therefore, that there was nothing unlawful in the

Comptroller's action in granting the charter without a written opinion."

While the file before the Court does not contain any findings or conclusions or any formal opinion, it does establish adequately and indeed abundantly why the Comptroller decided to deny the original application and to grant the alternative one. The basis for the Comptroller's final decision is to be found in the following items in the file:

1. A staff memorandum dated May 15, 1973, and signed by the Acting Comptroller General personally and by some of his high ranking subordinates indicating disapproval of the original application.

2. Memorandum of Chief Bank Examiner Leaf, dated May 23, and recommending granting of branch bank authority if capital was increased by $100,000.

3. A handwritten note of Deputy Comptroller General Blanchard, dated May 25, 1973, and recommending approval of a branch bank application if applicant's capital should be increased by $100,000.

4. Memorandum of Mr. Leaf to same effect and dated June 19.

5. Letter from Mr. Leaf to counsel for plaintiffs dated July 6, 1973, and setting out in a general way the considerations of the agency and reasons for its action.

6. Memorandum from Mr. Leaf to Comptroller General Smith, dated October 12, 1973, and dealing with plaintiffs' application for reconsideration.

7. Letter from Comptroller General Smith to counsel for plaintiffs, dated October 30, 1970, denying plaintiffs' request for reconsideration.

From a consideration of those items, it is clear to the Court that the agency thinking was substantially as follows: (1) That it is in the public interest to have a full service branch bank in Diaz. (2) That in view of changes in management and increased capital the applicant can provide the service or at least should have a chance to do so. (3) That the granting of authority to applicant to operate in Diaz will not cut into the business of the protestants unduly, and, indeed, will tend to stimulate competition in banking in the Newport-Diaz area. (4) That the granting of branch bank authority to applicant, rather than main office authority, will permit the Newport banks to establish branches in Diaz, if they care to do so.

Plaintiffs next complain that the Comptroller had no right to give any consideration whatever to the alternate application filed after the hearing record was closed in May 1973. That contention is also rejected.

■ In the first place, the Court thinks that the agency had the right under section 5.12 of the regulations to consider the alternate application without requiring the applicant to commence the entire administrative procedure anew.

More basically, the Court does not find that plaintiffs were prejudiced in any way by the agency's consideration of the alternate application. Ultimately, from the plaintiffs' standpoint the question was not so much one of main office authorization versus branch bank authorization as one of whether applicant should be granted any operating authority whatever to operate in Diaz. Plaintiffs certainly will not be hurt more by a branch bank operation than they would be by a main office operation, and, indeed, they are better off by reason of the fact that applicant received branch bank and not main bank authority because plaintiffs can now branch into Diaz which they could not have done had applicant been permitted to operate a main office in that community.

It is evident to the Court that in the course of the hearing held in April the banking picture at Diaz was fully developed, and that plaintiffs would not have offered in opposition to a branch bank application anything that they did not in fact offer in opposing the original application. And it is significant that plaintiffs have never asked that the

original administrative record be re-opened to permit them to oppose the alternative application as such. They have simply stood on the proposition that the Comptroller had no right to consider the alternative application at all; as indicated, the Court considers that proposition unsound.

■ It is contended that the Comptroller improperly received and considered certain materials submitted on behalf of the applicant which were not disclosed to plaintiffs and which plaintiffs had no opportunity to meet. The short answer to that contention is that under the statute and regulations plaintiffs were not entitled to a full adversary hearing in connection with the applications, and the Comptroller was not required to advise plaintiffs of each and every item of evidence or information that he might receive and which he might deem relevant. See Sterling National Bank of Davie v. Camp, supra, 431 F.2d at 516–517.

From its consideration of the entire administrative record the Court is satisfied that the procedures that were followed and that led up to the denial of the original application and the granting of the alternative application conformed to the statute and regulations, and were proper.

### IV.

This brings the Court at last to the question of whether the action of the Comptroller in granting the alternative application amounted to an abuse of discretion, or whether he acted arbitrarily or capriciously. On that question the plaintiffs have the laboring oar.

Notice may be taken of the fact that whenever a group of people undertake to obtain a charter for a new national bank, or whenever an existing national bank undertakes to change its location or to open a branch bank, the undertaking will almost invariably be opposed by other banks which will be subjected to competition or additional competition should the application be granted. And,

if the controversy results in an administrative hearing, the evidence produced by the proponents and the protestants will normally be in sharp conflict. This case presents no exception to the general rule.

The administrative file exclusive of the transcript of the testimony taken in the course of the April 1973 hearing, but including exhibits introduced at that hearing and much other material, consists of more than 500 pages; and the transcript of the testimony consists of more than 300 pages. The applicant called eight witnesses to the stand; the protestants called 16. Those witnesses testified fully as to facts and with respect to their opinions.

While the Court is not measuring the action of the Comptroller by the "substantial evidence" rule, it appears to the Court that in fact each side presented substantial evidence in support of its position. The Court does not consider it necessary to abstract that evidence which the Court has considered carefully.

As might be expected, some of the evidence tended to support the application whereas other evidence militated against it. It was the function of the agency to weigh the competing considerations.

When the matter was finally submitted to the Comptroller, it was his function to determine what choice he should make among a number of options: (1) He could grant the original application and deny the alternative one. (2) He could grant the alternative application and deny the original one. (3) He could deny both applications.

As has been seen, the Comptroller chose the second of his options on condition that the capital of applicant be increased substantially. As has also been seen, the choice that he made was more favorable to plaintiffs than would have been a choice of the first option.

■ The Court thinks that a strong argument can be made for the proposition that the applicant should not have been given any operating authority in

Diaz, but the Court is not able to say that in making the choice that he made the Comptroller abused his discretion or acted arbitrarily or capriciously. On the contrary, the Court thinks that choice that the Comptroller made in the exercise of his discretion was a permissible one and had an adequate factual basis.

From what has been said it follows that the motions for summary judgment directed at the complaint will be granted, and the complaint will be dismissed.

That action will not affect the intervenor's counterclaim, and that claim will have to be litigated if the intervenor insists upon it as the intervenor has the right to do. However, there is a very brief comment about the counterclaim that the Court feels that it should make time although without in any sense prejudging the cause stated in that pleading.

Ignoring conclusory allegations about combination and conspiracy in restraint of trade and commerce and efforts to obtain a monopoly of the banking business in Jackson County or elsewhere, about all that the counterclaim alleges is that the two Newport banks cooperated with each other in opposing the applications of the intervenor. And if that is all that the intervenor can show, it will not have established any violation of the anti-trust laws.

The intervenor was undertaking to obtain authority to operate almost literally in the back yards of the two Newport banks. The Newport banks had a common interest in opposing that undertaking, and there is nothing sinister, conspiratorial, or unlawful in the mere fact that they may have made common cause in opposing the applications. Such cooperation in opposing applications for new or different operating authority is of common occurrence in businesses or industries which must be licensed to operate. It occurs in the transportation industry, in the communications industry, in the alcoholic beverage industry, and in others that could be mentioned, and basically there is nothing wrong or

illegal about it. This case, of course, may present more than legitimate cooperation between the two plaintiffs; the Court does not know about that. It does occur to the Court, however, that the principal controversy in this case is about the validity of the intervenor's operating authority, and the intervenor is prevailing with respect to that controversy. In such circumstances intervenor's management and counsel might do well to consider seriously whether they really desire to press the counterclaim any further. If they do, the Court should be advised by August 10, 1974.

An order in accordance with the foregoing will be entered.