**BRIDGEPORT FEDERAL SAVINGS
AND LOAN ASSOCIATION,
Appellant,**

v.

**FEDERAL HOME LOAN BANK BOARD
and Quaker City Federal Savings and
Loan Association.**

**No. 13930.**

United States Court of Appeals
Third Circuit.

Argued May 10, 1962.

Decided Aug. 1, 1962.

Desmond J. McTighe, Norristown, Pa.
(Lawrence A. Brown, Philip D. Weiss,
Duffy, McTighe & McElhone, Norristown, Pa., on the brief), for appellant.

Patrick T. Ryan, Philadelphia, Pa.
(Raymond K. Denworth, Drinker Biddle & Reath, Philadelphia, Pa., on the
brief), for appellee, Quaker City Federal
Savings and Loan Assn.

Albion W. Fenderson, Washington, D.
C. (Drew J. T. O'Keefe, U. S. Atty.,
Eastern Dist. of Pennsylvania, James
McGirr Kelly, Joseph R. Ritchie, Jr.,
Ray E. Dougherty, Paul E. McGraw,
Washington, D. C., Thomas H. Creighton, Jr., Gen. Counsel, of counsel, on the
brief), for Federal Home Loan Bank Bd.

Before McLAUGHLIN, STALEY and
GANEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The Federal Home Loan Bank Board approved the application of Quaker City Federal Savings and Loan Association for permission to establish a branch office in King of Prussia, Upper Merion Township, Montgomery County, Pennsylvania.[1] Bridgeport Federal Savings and Loan Association, complaining of the decision, filed a complaint in the district court against the Board and Quaker City, seeking declaratory and injunctive relief. The district judge granted the defense motions to dismiss the complaint on the ground that it failed to state a claim upon which relief can be granted. Bridgeport appeals.

■■ Preliminarily, Bridgeport, under the facts, has standing to complain of the Board's action. North Arlington Nat. Bank v. Kearny Fed. Sav. & L. Ass'n, 187 F.2d 564, 565 (3 Cir. 1951). And the Board's authority to permit branch offices for chartered Federal savings and loan associations is soundly established. North Arlington Nat. Bank v. Kearny Fed. Sav. & L. Ass'n, supra; First National Bank v. First Federal Savings and Loan Association, 225 F.2d 33 (D.C.Cir. 1955). Springfield Institution v. Worcester Federal Savings and Loan Association, 329 Mass. 184, 107 N.E.2d 315 (1952), cert. den.

344 U.S. 884, 73 S.Ct. 184, 97 L.Ed. 684 (1952); 12 C.F.R. 545.14.

■ It seems to us also that the district judge was right in concluding that in the first instance there would have been no necessity for a Board hearing on the Quaker City application for the branch involved.[2] That is the specific holding in the First National Bank opinion, supra, where the court said page 36: "Section 5 of the Administrative Procedure Act, 5 U.S.C.A. § 1004, requires that 'in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing' (except in six listed circumstances not here applicable), an agency shall observe certain procedures specified in subsequent sections of that act. Neither the Home Owners' Loan Act of 1933, as amended, nor the regulations thereunder, contains any provision that an application for a branch must be 'determined on the record after opportunity for an agency hearing.'" See also Federal Home Loan Bank Board v. Rowe, 109 U.S.App.D.C. 140, 284 F.2d 274 (1960); 12 C.F.R. 542.2.[3]

This brings us to the main issue in the appeal. After the present Quaker City application was filed with it, the Board fixed a hearing date for the application as June 20, 1960. A hearing was held June 20, 21, 22, 1960. There was testi-

---

1. The Board found "that a necessity exists for a branch office * * * in the immediate vicinity * * *, there is a reasonable probability of its usefulness and success, and said branch office can be established at such locality without undue injury to properly conducted existing local thrift and home-financing institutions * * *." This is substantially the same language appearing in Section 5(e) of the HOLA, 12 U.S.C.A. § 1464(e) setting forth the criteria for the granting of charter applications. The same criteria are apparently used by the Board for the granting of branch office applications. See Breisacher, The Handling of Applications for Federal Savings and Loan Association Charters and Branch Offices by the Federal Home Loan Bank Board, 16 Bus.Law 146, 150 (1960). See also North Arlington Nat. Bank v. Kearny Fed. Sav. & L. Ass'n, 187 F.2d 564, 576; Curry, Basic Factors Affecting Federal Home Loan Bank Board Decisions, 15 Bus.Law 238 (1959).

2. Nor is the Federal Reserve Board, see 12 C.F.R. Section 262.4, or the Comptroller of the Currency, see 26 F.R. 11353, eff. Dec. 12, 1961, 12 C.F.R. 4.8a, required to conduct hearings with respect to membership, charter or branch applications. And see 1 Davis, Administrative Law Treatise (1958), Section 4.04.

3. It is provided in 12 C.F.R. Section 542.2 that "The Board may order a hearing in connection with the consideration of any matter arising under any provision of the rules and regulations in this subchapter, whether or not any request therefor has been made by any person. The Board may deny any request for, or dispense with, any hearing for which this section provides when, in its judgment, no need therefor exists."

mony for the applicant and for Bridgeport and two other protesting Federal savings and loan associations. Bridgeport complains that the hearing was not full and fair. Prior to the hearing it asked the Board for subpoenas duces tecum to be served on Quaker City and Upper Merion Township. The Board notified Bridgeport it had no subpoena power and could not issue the requested subpoenas. Bridgeport also requested the Board to produce at the hearing its correspondence and minutes and reports relating to the application. The Board denied the request because the matters requested were intra office and not subject to public inspection.

We see no argument in appellant's brief regarding the subpoena duces tecum point; in any event we are not referred to or have we found anything to contradict the Board's statement that it does not possess subpoena power in application proceedings. However, refusal of the request to the Board for its data regarding the Quaker City branch application and the circumscription of Bridgeport's cross-examination are more than sufficient to bring up the question of whether the kind of hearing which was held satisfied procedural due process.

The hearing was designedly limited in scope. The Board states it was called "to help the Board get external economic facts and the view of interested parties to aid in its decision * * *." Admittedly, confidential financial information concerning the applicant was not permitted to be made available to the objectors at the hearing; for example, the hearing examiner ruled:

"There is a division of supervision which has authority over the associations and goes into their reserve position. Now, the Board requested an opinion from this division as to their reserve position. * * * If a protestant feels there is an association engaging in unsound practices, and not a proper association, the Board will not allow these matters to be gone into at this hearing. A communication can be sent to the Board or to the supervising authorities, if you feel you want to take it up. But I will not allow you to take it up at this hearing."

It is that sort of restriction that is protested, appellant stating that "once those records became material to this application and were, in fact, considered by the Board in arriving at its decision, those records lost their confidential nature as among the Board, the Applicant and the Protestants." In connection with this appellant contends that the Board must follow the Administrative Procedure Act in allowing association branches but, as we have seen, this particular agency is not one of those tied into the adjudication procedures of that Act. Nor does the original question concerning the competition from the new Quaker City branch to the complaining associations of itself produce a constitutional question and thus create the necessity of a hearing initially. With that background, the Board held a hearing for its specific purpose of obtaining certain particular information it desired in connection with its appraisal of the application before it. This seems generally akin to the problem passed on in Ludecke v. Watkins, 335 U.S. 160, pp. 171, 172, 68 S.Ct. 1429, pp. 1434, 1435, 92 L.Ed. 1881 (1948), where the Court held:

"The fact that hearings are utilized by the Executive to secure an informed basis for the exercise of summary power does not argue the right of courts to retry such hearings, nor bespeak denial of due process to withhold such power from the courts."

The non-disclosure of information was in complete accord with the controlling regulation in 12 C.F.R. § 505.12 which provides that:

"The giving out of any such records or information, or documents relative thereto * * * is held to be contrary to public policy by reason of its privileged and confidential character involving delicate and sensitive matters relating to the con-

dition and affairs of financial institutions and not to be permitted."

The use and non-disclosure of confidential information is common practice in the banking field and has been so recognized and sanctioned by Congress. In Monograph No. 13, Senate Document No. 186, 76th Cong., 3d Sess., 43 (1940–41), it is noted that:

"The nature of banking and the public interest in banks shape the procedural aspects of bank supervision in forms different from those encountered in other branches of administrative regulation. By reason of the fact that few banks operating at a profit can, upon demand, pay off its depositors in cash, there has been traditionally a policy of withholding from the public all information which, either with or without justification [i. e. because of public understanding or misunderstanding], might provoke a depositors' run on a bank. * * * As a corollary, the exercise of supervisory powers over banks has traditionally been attended by a secrecy antithetical to the publicity which marks most regulatory agencies."

In refusing to recommend to Congress "that either hearings be held prior to denial [of applications] or that in all cases the identity of the author of the adverse evidence be disclosed to the applicant", the Attorney General's Committee on administrative procedure in federal agencies pointed out that in

"determining whether individuals are suited to engage in the banking business, or whether the community needs a bank, or whether a bank should be insured and similar questions, a congeries of imponderables is involved, calling for almost intuitive judgment so that hearings are not ordinarily useful, and that the banking business is a delicate one so that the advantages and importance of ready and frank information may outweigh the dangers of accepting confidential information."

Senate Document No. 8, Vol. 2, 77th Cong., 1st Sess., 143 (1941). See Federal Home Loan Bank Board v. Rowe, 109 U.S.App.D.C. 140, 284 F.2d at 278. The fact that banking agencies such as the Board have "the power of close supervision of day to day operations * * *", 1 Davis, Administrative Law Treatise (1958), Section 4.04, p. 248, must also be considered. The functions of the Board, some of which are investigatory in nature, minimize possible dangers from the use of confidential reports.[4]

Appellant in its sincere and well presented argument relies, as it must, primarily on cases led by Interstate Commerce Commission v. Louisville and Nashville R.R., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913) and Ohio Bell Telephone Co. v. Public Utilities Commission

---

4. Cf. Apfel v. Mellon, 33 F.2d 805, 807–808 (D.C.Cir. 1929):

"It is reasonable to believe that Congress intended that a careful investigation should be made by the Federal Reserve Board concerning the character and competency of the incorporators of such an enterprise, as one of the means of determining whether to grant or withhold their approval of the application for incorporation.

* * * * *

"The statutes relating to the organization of national banks are analogous to those now in question. It is therefore proper to note that the Comptroller of the Currency has prescribed the following as one of the regulations governing the investigations to be made by the examiners relating to applications for national bank charters: 'In making this investigation the examiner is instructed to give full consideration to all factors entering into the proposition. Among other matters to be considered are: First, the general character and experience of the organizers and of the proposed officers of the new bank; second, the adequacy of existing banking facilities and the need of further banking capital; third, the outlook for the growth and development of the town or city in which the bank is to be located; fourth, the methods and banking practices of the existing bank or banks, the interest rates which they charge to customers, and the character of the service which as quasi-public institutions they are rendering to their community; fifth, the reasonable prospects for success of the new bank if efficiently managed.'"

584

of Ohio, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937). These are of no help with respect to the agency before us. In the first of them the statute gave the right to full hearing with the privilege of introducing testimony " * * * and at the same time imposed the duty of deciding in accordance with the facts proved." And the rates prescribed by the Interstate Commerce Commission had to be supportable by "substantial evidence". 227 U.S. 91, 94, 33 S.Ct. 186, 188. The Public Utilities Commission litigation is just as foreign to our issue.

The Federal Home Loan Bank Board is an agency which has been granted a broad discretion by the Congress in its disposition of applications of the type involved. The rulings of the Board are the result of its expert judgment, its policy, the reports, recommendations and analyses of its staff, plus any special evidence it might conclude necessary to obtain by way of hearing. Congress recognized that if this agency was to really operate successfully in the huge area of public service to which it is assigned, it needed wide discretionary powers in its day to day practical decisions and granted the Board that authority. Through the years, the generally admirable results obtained by the Board in its own peculiarly sensitive banking field have confirmed the wisdom of the judgment that "the advantages and importance of ready and frank information" gathered by the Board through reports submitted by financial institutions, audits and investigations will "outweigh the danger of accepting confidential information" and using it in passing upon applications before it. It is not the perfect solution but it is a solution that has gotten this phase of the Board's important public business done in creditable fashion. The decision law supports that method. As we see it the facts of this appeal do not call for any change in that procedure. Even if a change were indicated now or later that would be for the consideration of the Congress.

The judgment of the district court will be affirmed.