**BANK OF OZARK, Plaintiff,**

v.

**FEDERAL HOME LOAN BANK BOARD
et al., Defendants.**

**No. LR–74–C–408.**

United States District Court,
E. D. Arkansas, W. D.

Aug. 27, 1975.

**164**

John P. Gill, Harold H. Simpson, II, Little Rock, Ark., for plaintiff.

Harvey Simon, Federal Home Loan Bank Board, Washington, D. C., Roy R. Gean, Jr., Fort Smith, Ark., for First Federal Savings and Loan Association of Fort Smith.

## MEMORANDUM OPINION

HENLEY, Circuit Judge, Sitting By Designation.

This is a suit for declaratory and injunctive relief brought by plaintiff, Bank of Ozark, against the Federal Home Loan Bank Board, the members of the Board, and First Federal Savings and Loan Association of Fort Smith, Arkansas.[1] By this action the Bank, which is chartered under the laws of Arkansas and has its principal place of business in the City of Ozark, Franklin County, Arkansas, seeks to invalidate the action of the Board, expressed in a resolution adopted on November 22, 1974, granting the application of First Federal Savings and Loan Association of Fort Smith for authority to open a branch office in Ozark.

The Bank contends, and the Board and the applicant deny, that in the course of the proceedings before the agency the Bank was denied procedural due process

1. Plaintiff will generally be referred to as the Bank; the Federal Home Loan Bank Board and its members will be referred to collectively as the Board; and First Federal Savings and Loan Association of Fort Smith will be called "applicant."

of law, and, further, that the action ultimately taken by the Board amounted to a violation of substantive due process. The case has been submitted on the pleadings and exhibits, motions for summary judgment filed by the defendants, the administrative record compiled in the agency proceedings, including a transcript of an oral argument of counsel heard by the local Supervisory Agent of the Board, memorandum briefs, and oral arguments made before the Court on August 15, 1975.

The Board's resolution was adopted pursuant to the authority conferred upon it by § 5 of the Home Owners' Loan Act of 1933, as amended, 12 U.S.C. § 1464(a). The application, which was opposed before the agency by the Bank and by First Savings and Loan Association of Clarksville, Arkansas, was considered in conformity with the procedures established by the Board's regulations dealing with branch applications, which regulations appear as 12 C.F.R. § 545.14. As is its custom under the regulations the Board held no evidentiary hearing and filed no formal findings of fact or conclusions of law or any formal opinion setting forth the basis for its ultimate conclusion that the application should be granted. As indicated, oral argument was heard by a Supervisory Agent of the Board. In line with the provisions of 12 C.F.R. § 545.14(c), the Board's resolution recited that there was a need for the proposed service, that there was a reasonable probability that the operation would succeed and be useful, and that the proposed branch office would not unduly injure properly managed existing thrift and home financing institutions in the area.

The Court is met at the outset with two preliminary questions.

■ While there is no question that Board action in connection with applications for operating authority is subject to judicial review under the relevant provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., the Board asserts that it is not subject to suit as an entity by the Bank since 12 U.S.C. § 1464(d) specifies only that the Board may be sued by federally chartered federal savings and loan associations and by their officers and directors. The Board points out that the Bank does not come within the purview of that subsection of the Act. Support for the Board's position is found in *Central Savings & Loan Ass'n of Chariton, Iowa v. Federal Home Loan Bank Board*, 293 F. Supp. 617 (S.D.Ia.1968), *aff'd*, 422 F.2d 504 (8th Cir. 1970). In that case Judge Stephenson held that banks and state chartered savings and loan associations cannot maintain an action against the Board as an entity. That ruling was not challenged on appeal. 422 F.2d at 505, and this Court accepts it. Actually, the question is not important because it was conceded in argument that the individual members of the Board, who are defendants here, are subject to suit and because the Court has jurisdiction of the applicant under the general "federal question" jurisdiction conferred by 28 U.S.C. § 1331(a).

■ The second preliminary question is whether a commercial bank has standing to challenge a determination by the Board that branch operating authority should be granted to a federal savings and loan association. The question is not without interest, and the Court has seen no reported case in which it was squarely presented. While both commercial banks and savings and loan associations are financial institutions, and while both institutions accept savings deposits on which they pay interest and make loans on which they charge interest, the functions that they perform in the business world are substantially different, and the extent to which they compete with each other is limited and varies from time to time and place to place and depends in large measure on prevailing economic conditions. A good description of the commercial banking system in this country and of federal regulation thereof will be found in *United States v. Philadelphia National Bank*,

374 U.S. 321, 324–30, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). However, aside from any question of competition or of adverse economic impact that the granting of the application may have on the Bank, the Court is satisfied that the Bank in the public interest has standing to complain of any illegal agency action in connection with the granting of the application and thus has standing to maintain the suit. *Cf., Federal Communications Comm. v. Sanders Bros. Radio Station,* 309 U.S. 470, 476–77, 60 S.Ct. 693, 84 L.Ed. 869 (1940).

 In support of its claim that it was denied procedural due process of law the Bank contends that it was constitutionally entitled to an evidentiary hearing, to findings of fact and conclusions of law, to a reasoned agency opinion, and to a de novo consideration by this Court of the merits of the challenged application. The Court rejects those contentions.

In passing on a branch application the function that the Board performs is essentially the same as that performed by the Comptroller of the Currency when he considers under 12 U.S.C. § 36 an application of a national bank for authority to establish a branch. Hence, principles laid down in cases involving the Comptroller are applicable to cases involving the Board. *Benton Savings & Loan Ass'n v. Federal Home Loan Bank Board,* 365 F.Supp. 1103 ·(E.D.Ark. 1973); *Guaranty Savings & Loan Ass'n v. Federal Home Loan Bank Board,* 330 F.Supp 470 (D.C.D.C.1971).

In passing on a branch application the Board exercises a function which is largely discretionary, although the discretion of the Board is not unlimited. While the action of the agency is subject to judicial review, the scope of that review is narrow. And it is now established beyond doubt that the Board is

not required by the Constitution, the Home Owners' Loan Act, or the Administrative Procedure Act to conduct adversary evidentiary hearings, to make formal findings of fact, to draw formal conclusions of law, or to file written opinions supporting the actions taken; nor is the party seeking review entitled to a de novo hearing before the reviewing court. *Pitts v. Camp,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Merchants & Planters Bank of Newport, Arkansas v. Smith,* 516 F.2d 355 (8th Cir. 1975), aff'g *Merchants & Planters Bank of Newport v. Smith,* 380 F.Supp. 354 (E.D.Ark.1974); *First National Bank of Fayetteville v. Smith,* 508 F.2d 1371 (8th Cir. 1974); *Central Savings & Loan Ass'n v. Federal Home Loan Bank Board,* 422 F.2d 504 (8th Cir. 1970); *Webster Groves Trust Co. v. Saxon,* 370 F.2d 381 (8th Cir. 1966); *Bridgeport Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board,* 307 F.2d 580 (3d Cir. 1962), cert. denied, 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499 (1963); *Benton Savings & Loan Ass'n v. Federal Home Loan Bank Board, supra; Guaranty Savings & Loan Ass'n v. Federal Home Loan Bank Board, supra.*

In *Pitts v. Camp, supra,* the Supreme Court rejected the view that had been taken by the Court of Appeals for the Fourth Circuit that where the Board does not hold an evidentiary hearing and where the basis for the administrative action does not appear clearly in the administrative record, the protesting party is entitled to a de novo judicial hearing.[2] Citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court held that where the administrative record is inadequate to enable the reviewing court to determine the basis of the agency action, the remedy is not a de novo hearing but the obtaining from the agen-

2. In the cited case the Supreme Court vacated the judgment of the Court of Appeals in *Pitts v. Camp,* 463 F.2d 632 (4th Cir. 1972), and remanded the case for further proceed-

ings. The decision of the Court of Appeals was in line with its earlier decision in *First National Bank of Smithfield v. Saxon,* 352 F.2d 267 (4th Cir. 1965).

cy by appropriate means of "such additional explanation of the reasons for the agency decision as may prove necessary." 411 U.S. at 143, 93 S.Ct. at 1244. And it was stated that if the administrative record is insufficient to sustain the action taken, the administrative decision should be vacated and the case remanded for further consideration. *Ibid.*

The argument that the Fifth Amendment required the Board to hold a hearing was specifically rejected in *Guaranty Savings & Loan Ass'n v. Federal Home Loan Bank Board, supra,* 330 F. Supp. at 472.[3] It is true, and cases cited by counsel for the Bank establish that some administrative actions may have such an impact on the liberty and property of individuals and corporations that due process requires an evidentiary hearing, but this is not such a case.

Counsel for the Bank complain that the applicant submitted certain inaccurate data to the Board confidentially. In connection with an application for licensing authority for a financial institution, it is not unusual for the licensing agency to receive confidential data, and the practice has been approved and indeed found desirable. *Sterling National Bank of Davie v. Camp,* 431 F.2d 514, 516–17 (5th Cir. 1970); *Webster Groves Trust Co. v. Saxon, supra,* 370 F.2d at 385; *Bridgeport Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board, supra,* 307 F.2d at 582–83; see also this Court's opinion in *Merchants & Planters Bank of Newport v. Smith, supra,* 380 F.Supp. at 363. Therefore, the Court rejects the contention of the Bank based on the confidentiality of the submission of the data. At a later point in this opinion the Court will deal with the claim that the data in question were inaccurate.

Turning now to the Bank's claim that the action of the Board violated substantive due process, the Court again calls attention to and emphasizes the limited scope of judicial review that is available to the Bank in this action. The Court neither tries the case de novo nor is it required to judge the administrative action by the "substantial evidence" test. The Court's inquiry is limited to the question whether the Board in granting the application before it acted arbitrarily or capriciously or abused the broad discretion vested in it. *Merchants & Planters Bank of Newport v. Smith* and *First National Bank of Fayetteville v. Smith,* both *supra.* Moreover, the action of the Board is presumptively valid. *Cf., Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 415, 91 S.Ct. 814.

 The record reflects that applicant is a large financial institution with its principal office in Fort Smith, Sebastian County, Arkansas. As of April 30, 1974 applicant had assets of some $132 million; it held outstanding first mortgage loans totalling more than $114 million and other loans in excess of $2 million. Its savings deposits amounted to nearly $113 million. In addition to its main office, applicant was operating or had been authorized to operate two branch offices in Fort Smith and branch offices in Mena, Van Buren, Greenwood, and Booneville in Western Arkansas.

The application described a "primary service area" (PSA) consisting of all of Franklin County north of the Arkansas River, including the City of Ozark where the proposed branch office is to be located, and one political township in Franklin County south of the river.

The Court takes notice of the fact that Franklin County is what may be termed a West Central Arkansas county in the valley of the Arkansas River. It is bounded on the north by Madison County, on the east by Johnson County, on the south by Logan and Yell Counties, and on the west by Crawford and Sebastian Counties. The river divides the County into a north part and a south part which are connected by a bridge at

3. See also the cases cited in that opinion.

Ozark which is located on the north bank of the river. The County has two county seats; Ozark is the county seat of the north part of the County, and Charleston is the county seat of the south part.

The economy of Franklin County is predominantly agricultural, although there is some light industry including two wineries in the small town of Altus. From the standpoint of population, Franklin County is one of the smaller counties of the State. While it has experienced some marked growth in population in recent years, its population in 1970 and 1972 was less that it was in 1950 and indeed was less than it was in 1930. The north portion of the county is much more prosperous and populous than the south portion.

While the applicant has never had a branch office in Franklin County, it has actually operated in the PSA for a number of years. In 1974 it claimed to have 648 savings acounts in the area amounting to a little more than $4 million; and it held 38 mortgage loans in the area amounting to nearly one half million dollars. Applicant's business in the PSA has been conducted out of its main office in Fort Smith; applicant's customers in the area have dealt with applicant either by mail or by driving to and from Fort Smith which is about 35 miles from Ozark.

Applicant pays interest, of course, on its savings deposits and collects interest on the housing loans that it makes. The rates of interest that it pays on deposits vary to some extent with the amount of individual deposits and with the length of time for which individual deposits are committed. The rates of interest which applicant charges on its loans depend to some extent upon the type of loan and upon the initial amount of equity carried by the borrower.

According to the census of 1970, Franklin County as a whole had a population of 11,301, and according to a population estimate made in 1972 the population was 11,300. In 1970 the population of PSA including Ozark, was 7,584, and the population of Ozark itself was 2,592.

In 1974 the financial needs of Franklin County were served by public lending agencies such as the Farmers Home Administration, and one or more Production Credit Associations, and by five privately owned financial institutions, including the applicant. There were, and are, two banks in the County. There is the plaintiff Bank and there is the American State Bank located at Charleston in the southwest part of the County. The American State Bank is a smaller bank than the plaintiff Bank, and it is fairly inferable that the former bank's activities center in and around Charleston and in the southern part of the County. In addition to those banks and to the operations of applicant in northern Franklin County, the Clarksville Savings and Loan Association, a state chartered institution, maintained a branch office in Ozark, and Superior Federal Savings and Loan Association of Fort Smith had a mobile unit which visited Ozark one day a week.

The materials submitted to the Board by the applicant, on the one hand, and by the protestants on the other, consisted of underlying statistical data, analyses of those data, and forecasts of future business growth in the PSA.

As might be expected, the point of view taken by applicant was highly optimistic, and that taken by the protestants was the reverse. The application and its exhibits were designed to convince the agency that the PSA was a rapidly growing and expanding area with it to be expected that the growth and expansion will continue; that the area contained a large untapped reservoir of potential savings; that there was a substantial market for housing loans; and that a branch office of applicant would be successful and would not materially damage existing financial institutions. The protests and their exhibits, on the other hand, were designed to persuade the Board that the PSA was not growing

substantially; that business conditions therein were stagnant if not deteriorating; that the savings potential in PSA was not large; that there was little demand for housing loans; that PSA was already adequately served by existing financial institutions; and that to permit applicant to open a branch office in Ozark would seriously damage the bank and the two other savings and loan associations that have been mentioned.

In the Court's view, the record made before the Board might have swayed the administrative discretion either way. Were the Court trying the case de novo, it might well conclude that Ozark and northern Franklin County do not at this time need another localized savings and loan institution, and that to permit a large and aggressive association based in Fort Smith to establish a branch office in Ozark might well inflict "undue" injury to the Franklin County operations of Clarksville Savings and Loan Association and Superior Federal Savings and Loan Association, and might be to some extent harmful to the Bank. But as has been stated, the Court is not trying the case de novo, and the Court cannot say from what is before it that the Board acted arbitrarily or capriciously or abused its discretion in granting the application. As the Court sees it, it was open to the Board to conclude that if the applicant wanted to take the financial risk involved in opening a branch office in Ozark, it should be permitted to do so.

 Counsel for the Bank contend that the Board improperly failed to consider the impact of applicant's proposed operation of the Bank, as opposed to existing savings and loan associations. While the Court thinks that the contention is without merit, it calls for some comment.

Since the Board filed no findings of fact, conclusions of law, or opinion, it is not possible for the Court to determine from the administrative record whether or to what extent the Board gave specific consideration to the impact or possible impact that the granting of the application would or might have on the Bank as an individual financial institution, although the Board obviously knew of the Bank's existence and opposition to the application and must have known that if the application should be granted some savings or time deposits would or might be shifted from the Bank to the applicant and that the applicant would or might make some housing loans that the Bank would or might have made itself had the application been denied. In the course of the argument counsel for the Board in effect conceded that the Board did not consider the impact on the Bank of a granting of the application since the Bank is not a "thrift" or "home-financing" institution within the meaning of the Act and the regulations. And the Court will assume that the Board did not take into specific consideration injury to the Bank that might result should the applicant be permitted to establish the proposed branch office.

The basic difficulty with the Bank's contention now being discussed is that the Bank is not *constitutionally* entitled to continue to operate in Ozark free from the competition of another savings and loan association. At most, the Bank is entitled to complain only that in granting the application the Board abused the discretion vested in it by the Act and the regulations or that it failed to follow its own guidelines set forth in the regulations. *See Webster Groves Trust Co. v. Saxon, supra,* 370 F.2d at 388, and cases there cited, and *First National Bank of Smithfield v. Saxon,* 352 F.2d 267 (4th Cir. 1965). And neither the statute nor the regulations required the Board to consider the Bank's financial welfare in passing on the application.[4]

4. The statement just made is obviously not unrelated to the question of the standing of the Bank to maintain the suit. It may be argued that if the Bank is not in a position to complain about the Board's failure to consider the impact on the Bank of granting

But, even if the case should be remanded to the Board with directions to consider the effect that a branch office of the applicant will have on the Bank it is rather obvious that no different administrative result would be reached; and the Court is satisfied from materials in the record that the granting of the application after considering possible adverse effects on the Bank would not constitute an abuse of discretion. *See Central Savings and Loan Ass'n v. Federal Home Loan Bank Board, supra,* 422 F.2d at 507, wherein it was said:

". . . The ultimate effects of the operation of mobile facilities [of a federal savings and loan association], be they beneficial or detrimental, fall within the scope of those issues statutorily committed to the exclusive discretion of the Board. . . ."

The growth history of the Bank from 1967 through 1973 is shown in applicant's exhibit No. I–C–3(d) which accompanied the application. During those years the Bank was in limited competition for at least part of the time with three savings and loan associations including the applicant, and the Bank grew from a $5 million bank to a $14 million one. Its loan volume increased from a little over $1 million in 1967 to more than $6.5 million in 1973; and its total deposits went up from $4,466,464.-00 to $12,271,910.00. In 1967 the Bank had demand deposits of more than $4.5 million but only $15 thousand in "time deposits" including passbook savings accounts. As of 1973 its time deposits substantially exceeded its demand deposits.

Applicant's exhibit No. I–D–1(a) reflects that as of April 24, 1974 total private deposits in the Bank amounted to $12,263,471.00 to which should be added federal deposits of a little over $58 thousand and state and local public deposits of somewhat more than $1 million, and that the grand total of all deposits was $13,392,270.00. The demand deposits of individuals, partnerships, and corporations totalled $5,464,852.81 and private time deposits totalled $6,798,618.26. On the other side of the ledger, outstanding private loans held by the Bank amounted to only $6,384,582.56, an amount substantially less than the private time deposits held by the Bank.

From the figures just given it is evident that the Bank has been managed very conservatively. While it doubtless makes some housing loans, the record indicates that it does not make many, and it has no particular motive to do so. The Bank, of course, would prefer not to have a branch office of applicant in Ozark, but there is no basis for saying that such an office would necessarily "unduly injure" the Bank. On the contrary, such an operation may help the Bank ultimately.

█ Finally, it is necessary to deal briefly with the claim of the Bank that the confidential data submitted to the Board, as heretofore indicated, were inaccurate. The data in question related to the applicant's claim that in 1974 it had 648 savings accounts in PSA amounting to more than $4 million. The material submitted by the applicant consisted of a list of the depositors who it claimed lived in PSA, which list included their post office addresses and zip codes. In the course of the argument before the Board the Bank submitted affidavits from a number of postmasters in Franklin and Johnson Counties which were to the effect that the service areas of some of the postoffices shown on the list submitted by the applicant to the Board did not include any part of PSA, or that part of their service areas was outside PSA. And the affidavit of the postmaster at Ozark was to the effect that the

the application, the Bank has no standing to maintain the suit at all. However, in the Court's opinion the question of the Bank's standing to maintain the action is separate from the question of the Bank's right to complain of the Board's failure, if any, to consider an adverse economic effect on the Bank of a granting of the application in question. *Cf., Federal Communications Comm. v. Sanders Bros. Radio Station, supra.*

postoffice at Mountain Top, 72850, which formerly served certain townships in PSA, had been closed.

Accepting the affidavits of the postmasters as true and viewing them in the light most favorable to the Bank the most that they establish is that the claims of the applicant may have been to some extent exaggerated. It is clear to the Court, however, that as a practical matter the exaggeration was not large, that it could not have misled the Board substantially, and that it did not materially influence the Board or prejudice the rights of the protestants, including the Bank.

A judgment dismissing the complaint will be entered.