BENTON COUNTY SAVINGS & LOAN ASSOCIATION et al., Plaintiffs,

v.

FEDERAL HOME LOAN BANK BOARD et al., Defendants.

Civ. No. 77–5009.

United States District Court,
W. D. Arkansas,
Fayetteville Division.

April 5, 1978.

Herman Ivester, Friday, Eldredge & Clark, Little Rock, Ark., for plaintiffs.

John Gunther, Federal Home Loan Bank Board, Washington, D. C., for defendant, Federal Home Loan Bank Board.

Roy Danuser, Mountain Home, Ark., Brad Jesson, Hardin, Jesson & Dawson, J. H. Evans, Warner & Smith, Fort Smith, Ark., for defendant, First Federal Savings & Loan of Harrison.

## MEMORANDUM OPINION

PAUL X WILLIAMS, Chief Judge.

This is an action to review a resolution of the Federal Home Loan Bank Board permitting the defendant, First Federal Savings & Loan Association of Harrison (Harrison) to establish a branch facility in Bentonville, Arkansas. This Court has jurisdiction pursuant to 28 U.S.C. § 1331(a) and 12 U.S.C. § 1464(d)(1).

The action was originally filed February 24, 1977, by six existing and established savings and loan associations in Washington and Benton Counties, Arkansas. On April 5, 1977, two of those associations, First Federal of Fayetteville, and First Federal of Rogers, dismissed their complaint without prejudice. The cause is pursued by the four remaining plaintiff associations: Benton County Savings & Loan Association of Bentonville, Arkansas (Benton); Liberty Savings & Loan Association of Siloam Springs, Arkansas (Liberty); Washington Federal Savings & Loan Association of Springdale, Arkansas (Washington); and Fayetteville Savings & Loan Association of Fayetteville, Arkansas (Fayetteville).

On July 16, 1976, First Federal Savings & Loan Association of Harrison filed application with the Board to establish a branch office on U.S. Highway 71 in Bentonville, Arkansas. Notice was published in accordance with applicable regulations and the plaintiffs filed formal protests. All parties supplied relevant economic data to the Board in support of their respective positions. The Board determined that the protests were "substantial" and set the matter for hearing and oral argument before a supervisory agent. Through their officers and attorneys all plaintiffs appeared in Little Rock, Arkansas, on September 21, 1976, and offered oral argument in opposition to the application. A copy of the application, protests, economic analyses and oral arguments are a part of the administrative record filed in this case. On January 12, 1977, the Federal Home Loan Bank Board approved the branch application by Resolution No. 77–35 and this action for review followed. All parties have filed motions for summary judgment and have waived oral argument.

The one preliminary issue is whether the Board has made available the complete administrative record. The plaintiffs contend that the Board should disclose certain data and supervisory ratings relating to the financial condition and operations of First Federal of Harrison. A similar argument was rejected by this Court in the recent case of *First Federal Savings & Loan Association v. Federal Home Loan Bank Board*, 426 F.Supp. 454 (W.D.Ark.1977), affirmed 570 F.2d 693 (8th Cir. 1978). The Court of Appeals stated at page 698:

"The district court found that in passing upon Superior's application, the Board acted pursuant to law and complied with the requirements of due process; that in granting the application the Board did not act without evidentiary support or arbitrarily or capriciously and did not abuse its discretion; and *that the Board was not required to disclose the recommendations that it had received from its staff and Supervisory Agent and*

*certain confidential financial material that it had received and considered.*

"We agree with the district judge. We think he correctly perceived the governing principles of law and permissibly applied them to the facts of the case." [Emphasis added]

In its Resolution No. 77–35, the Federal Home Loan Bank Board granted Harrison's branch application, having found that 1) there would be a necessity for the proposed branch office at the time Harrison contemplated its opening; 2) that there was a reasonable probability of usefulness and success on the part of the proposed branch office; and 3) that the proposed branch office could be established without undue injury to existing institutions. See 12 CFR § 545.14(c).

▮ In reviewing the actions of the Federal Home Loan Bank Board, this Court must affirm unless the Board erred in its application of the law or unless its factual determinations are and were arbitrary, capricious and an abuse of discretion. *First Federal Savings & Loan Association of Fayetteville v. FHLBB, supra; Bank of Ozark v. FHLBB,* 402 F.Supp. 162 (E.D.Ark.1975); *First National Bank of Fayetteville v. Smith,* 508 F.2d 1371 (8th Cir. 1974).

First Federal Savings & Loan Association of Harrison has its principal office in the City of Harrison, Boone County, Arkansas. At the time of filing the application for the branch at Bentonville, it was already operating other successful branches. Bentonville, Arkansas, is some 63 miles from Harrison, but both are located within what is generally described as Northwest Arkansas. First Federal of Harrison proposes to build a 2,400 square foot office building for its branch on the west side of U.S. Highway 71 just north of its intersection with North Third Street. Land in the vicinity of the site is devoted to commercial use and U.S. Highway 71 is the principal north-south traffic artery through Bentonville and Benton County. Much of the new commercial development taking place in Bentonville is located along this highway. The proposed branch would include all the usual and customary services afforded by a full service savings and loan branch facility.

The record before the Court amply demonstrates the tremendous growth and vitality of Northwest Arkansas in general and of Benton County in particular. The proposed primary market area (PMA) for the branch was designated as all of Benton County. Bentonville is a city of some 7,238 people and there are over 59,000 people presently residing in Benton County. This represents a growth in population for the county from 36,272 in 1960 to 50,476 in 1970. The population of Bentonville grew 34.9 percent between 1970 and 1975. Information in the record also reflects that Benton County has a large potential for new home construction, given the present rate of population growth, which will require an accelerated pace of mortgage lending. The number of year-round housing units in the PMA increased by 40.8 percent between 1960 and 1970 and the Northwest Arkansas Regional Planning Commission has estimated that the number of these units in the City of Bentonville increased by 28.5 percent between 1970 and 1975. This trend is expected to continue over the next 15 years.

Other standard economic indicators reflect a strong and growing economic base in Benton County. During the last decade the labor force, retail sales and personal income have all risen dramatically.

First Federal Savings & Loan Association of Harrison has already been active in the Benton County lending market. At the time of the application, First Federal of Harrison had $6,600,000 in home loans in Benton County and over $342,000 in savings accounts. It was estimated by Harrison that the branch would close some $4,000,000 in loans its first year to give it an outlet to invest some of its excess savings flow generated by its existing offices in Harrison and Mountain Home, Arkansas. The 6.6 million dollars in loans which First Federal of Harrison already has in Benton County represents 11.8 percent of the total loans of this association.

Benton County Savings & Loan Association is the only association having a office in Bentonville, Arkansas. No other association has a branch office there. It would be the association most directly affected by the establishment of the branch and the record reflects that it is a growing, strong financial institution fully capable of competing against the applicant for savings and loans in the Benton County market.

Benton County Savings & Loan had assets of over $28,000,000 as of September 30, 1976, as compared with assets of $6,868,000 in December of 1970. Its assets have increased over four times during the six years. In addition to its main office in Bentonville, Benton County has branch offices in Bella Vista, Arkansas, four miles to the north and in Siloam Springs, Arkansas, some 22.7 miles to the southwest.

The only other plaintiff-association with an office in Benton County is Liberty Savings & Loan Association of Siloam Springs. The record reflects that Liberty had over $12,000,000 in deposits as of September 30, 1976, as compared with $2,821,000 in December of 1970. This indicates extremely rapid growth. In addition to its home office in Siloam Springs, Liberty operates a branch office at Gravette, Arkansas, as well as one in the highly competitive market of Rogers, Arkansas. It is evident that both Benton County Savings & Loan and Liberty Savings and Loan have grown and prospered through branching activities. Neither association has hesitated to branch into a community which already had an existing savings and loan association as is demonstrated by the record reflecting the branching of Benton County Savings and Loan into Siloam Springs in 1975 and the branching of Liberty Savings & Loan into Rogers in 1972.

The two remaining plaintiffs in this action are both Washington County savings and loan associations and are outside the PMA. Washington has its only office in Springdale, Arkansas, and Fayetteville Savings has its only two offices in Fayetteville, Arkansas. The record demonstrates that the principal activities of these two associa-tions are far removed from the proposed branch at Bentonville, and will not be adversely affected by it.

■ The administrative record amply supports the Board's determination that a "necessity" exists for First Federal of Harrison's Bentonville branch and the same material also fully supports the reasonable probability of the proposed branch's "usefulness and success". The evidence adduced by the protesting associations indicates that all of them have experienced enormous asset growth between 1970 and 1975. This is further evidence that there is a reasonable probability of usefulness and success for First Federal of Harrison's Bentonville branch.

The question of undue injury must be, by its very nature, a matter of subjective evaluation and experienced judgment which is clearly within the Board's special expertise. The record clearly shows that the plaintiffs' fear that First Federal of Harrison's new branch will cause them undue injury is without merit and the Board's finding in this regard is amply supported in the record.

When the record is viewed as a whole, it offers ample evidence to support the Board's finding that a necessity existed for the branch office; that there was a reasonable probability of its usefulness and success and that its establishment would not unduly harm existing institutions. Therefore, the findings of the Board cannot be characterized as arbitrary, capricious or an abuse of discretion.

■ The plaintiffs also raise four additional points as a basis for reversing the decision of the Board. The first of these is the contention that the proposed branch is not a local office under 12 U.S.C. § 1464(a) and that the Board therefore had no statutory authority to approve it. In essence, the plaintiffs contend that the Board lacks authority to approve an application for a branch unless the majority of the organizers, directors and stockholders reside or do business in the community to be served by the branch. As this Court noted in *First*

*Federal Savings & Loan Association of Fayetteville, supra,* this requirement is applicable to those institutions seeking a federal charter or insurance from the Federal Savings and Loan Insurance Corporation and is not pertinent to approval of applications for branch facilities. The regulations which govern the establishment of branch offices set out the criteria the Board will consider in ruling on a branch application and there is no requirement of residence of the concerned individuals. See 12 C.F.R. § 556.5.

In its opinion concerning this point the Court of Appeals held in *First Federal of Fayetteville, supra,* at page 700 of 570 F.2d:

"Finally, we consider plaintiffs' argument that the relevant provisions of the Home Owners Loan Act of 1933 should be so construed as to limit the branching of established federal savings and loan associations to locations in such close proximity to their home offices that the branches may properly be considered as subject to the 'local control' said to be contemplated by 12 U.S.C. § 1464(a).

"In discussing that argument we will concede to the plaintiffs that if Superior's branch is established in Fayetteville, it will be controlled by Fort Smith and Sebastian County residents and not by persons residing in Fayetteville or Washington County. We do not think that that fact, however, precluded the Board from granting the application.

"Although Fayetteville, including its surrounding trade area, is a substantial distance north of Fort Smith, it is in Arkansas and is within one hundred miles of Fort Smith. And we are of the opinion that in the present state of law the Board had the discretionary power to authorize the branch in question assuming that the criteria set out in 12 C.F.R. § 545.14(c) were met, as the district court found that they were."

◾ In a similar vein the plaintiffs argue that the Federal Home Loan Bank Board is precluded from establishing branches of federal savings and loan associations in areas served by state chartered associations. This same argument was advanced unsuc-

cessfully by the protesting associations in the *First Federal of Fayetteville* case, *supra.* At page 462 of 426 F.Supp. this Court rejected the argument in the following language:

"The fourth issue raised in Fayetteville Savings and Loan's amended complaint concerns whether the Board erred in authorizing the branch office since the area is served by state chartered associations. In support of this proposition, it quotes certain language from *West Helena Savings and Loan v. Federal Home Loan Bank Board,* 417 F.Supp. 220 (E.D.Ark. 1976), a case concerning the right of the FSLIC to deny insurance to state-chartered building and loan institutions. 12 U.S.C. § 1464(3) provides as follows:

" '(e) No charter shall be granted except to persons of good character and responsibility, nor unless in the judgment of the Board a necessity exists for such an institution in the community to be served, nor unless there is a reasonable probability of its usefulness and success, nor unless the same can be established without undue injury to properly conducted existing local thrift and home-financing institutions.'

"As can be seen from the statute itself, the question is if the federally chartered institution would cause undue injury to existing state-chartered associations, not whether any state-chartered associations existed in the area. *Elm Grove Savings and Loan Association v. Federal Home Loan Bank Board,* 391 F.Supp. 1041 (E.D. Wis.1975) (Board's approval of branch facility was upheld, even though state-chartered institution was also serving the area); *Bank of Ozark v. Federal Home Loan Bank Board,* 402 F.Supp. 162 (W.D. Ark.1975)."

◾ Another ground for reversal urged by the plaintiffs is that the Board improperly and unlawfully shifted the burden of proof from the applicant to the protestants and in so doing denied them due process of law. This same contention was raised in the *First Federal of Fayetteville* case, *supra,* and was rejected by this Court as being

without merit and this rejection was affirmed by the Court of Appeals. In its opinion the Court of Appeals described the regulation complained of by the plaintiffs, 12 C.F.R. § 556.5(d)(5), as being "nothing more than a policy statement and does not shift the burden of proof with respect to a branching application from the proponent to the protestants." *First Federal Savings & Loan Association of Fayetteville v. Federal Home Loan Bank Board, supra*, at page 700.

■ Finally, the plaintiffs contend that the Board failed to comply with its duties under the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(C). Plaintiffs contend that the failure to issue an Environmental Impact Statement constitutes grounds for vacating the Board's approval and remanding the case to the Board for preparation of an appropriate statement.

The plaintiffs did not raise this question at any point during the administrative proceedings.

In *Association of Data Processing Service Organization v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) the Supreme Court enunciated a two-pronged test for determining standing to raise the environmental statement issue. First, the plaintiff must allege that the challenged acts have caused him "injury in fact, economic or otherwise" and second, "the interest sought to be protected by the complaint [must be] arguably within the zone of interests to be protected or regulated by the statute or the constitutional guarantee in question". In the instant case plaintiffs have not alleged that they will suffer any *environmental* injury as a result of the nonissuance of an Environmental Impact Statement in either their original or amended complaint.

In *United States v. SCRAP*, 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973) the Supreme Court held that in order to have standing:

". . . [a] plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action. And it is equally clear that the allegations must be true and capable of proof at trial . . ."

We specifically find that the plaintiffs in this action have failed to meet the first test of standing.

■■ In regard to the second test, the Court recognizes that the purpose of the National Environmental Protection Act is to prevent and eliminate damage to the environment. 42 U.S.C. § 4321. However, plaintiffs' sole motivation in this case is their own economic self interest and welfare. It was not the Congressional intent that the National Environmental Protection Act protect persons whose sole motivation is their own economic self interest and welfare. See *Churchill Truck Lines, Inc. v. United States*, 533 F.2d 411, 416 (8th Cir. 1976) and *Clinton Community Hospital Corp. v. Southern Maryland Medical Center*, 374 F.Supp. 450, 455, aff'd. 510 F.2d 1037, 1038 (4th Cir. 1975) cert. denied, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700.

Therefore, under the circumstances present in this case the Court finds that the plaintiffs again lack standing to raise the National Environmental Protection Act requirements.

■ The Court also finds that the Board was not required to prepare an Environmental Impact Statement. Again, this same argument was advanced in the *First Federal of Fayetteville* case, *supra*, and this Court disposed of the argument in the following language:

"Fayetteville Savings and Loan's third contention is that the Board erred in omitting discussion of whether an environmental impact statement was required. The record before the Board indicates that the proposed branch office would be located in the large parking lot of an existing shopping center. The record also reflects that the shopping center is adjacent to a heavily trafficked, four-lane highway. The record also demonstrates that the branch facility will not

cause the shopping center to extend its parking lot, nor will it appreciably increase the amount of traffic to and from the mall. Given these facts, we cannot say that the Board erred in failing to discuss the necessity of an environmental impact statement."

The record in this case reflects that the proposed branch will be located in an already existing commercial area along a heavily traveled commercial artery, U.S. Highway 71. The location in question has already been zoned for commercial use by the City of Bentonville.

In *Maryland-National Capitol Park and Planning Commission v. U. S. Postal Service*, 159 U.S.App.D.C. 158, 487 F.2d 1029 (1973) the plaintiff sought to enjoin construction of a mail handling center and alleged that the Postal Service violated its duty to file an Environmental Impact Statement. Rejecting this claim, the Court of Appeals said:

"[T]here may even be a presumption, that such incremental impact on the environment as is attributable to the particular land use proposed by the Federal Agency is not 'significant', that the basic environmental impact from the project derives from the land use pattern, approved by local authorities, that prevails generally for the same kind of use by private persons." *Ibid.* 159 U.S.App.D.C. at 165–166, at 1036–1037.

When the record is viewed as a whole, it is obvious that the Board did not take any action which "significantly affected the environment".

Having determined that the Federal Home Loan Bank Board did not err in its application of the law and that there is ample evidence in the record to support the Board's decision, the Court finds that the plaintiffs' petition for review should be denied and the defendants' motions for summary judgment should be granted.